### No. 2818

### Second Circuit

## COLLINS ET AL. v. THE T. & P. RY. CO.

(July 1, 1929. Opinion and Decree.)
(October 1, 1929. Rehearing Refused.)

T. H. McGregor, of Shreveport, attorney for plaintiffs, appellees.

Wise, Randolph, Rendall & Freyer, of Shreveport, attorneys for defendant, appellant.

ODOM, J. Plaintiffs purchased 60 head of horses and mules from Ross Bros., in Fort Worth, Tex., and had them shipped to Delhi, La., over defendant's line of railroad. When the shipment arrived at Delhi, there was one mule missing, two of the remaining 59 died within a short time, and all the others were gaunt, stiff and so badly emaciated that for some of them it took 5 days, and for others as long as 21 days, to restore them to such condition that they might be put on the market. Plaintiffs prosecute this suit against defendant, the initial carrier, to recover the value of the mules that died, and for $10 damage to each of the others, alleging that the death of the three mules and the damage to the others were due to the gross fault and negligence of defendant in handling the animals during the course of shipment. The defense, in substance, is a general denial. There was judgment for plaintiffs, and defendant appealed.

## OPINION

The only question presented for decision is whether the loss and damage sustained by plaintiffs were due to the fault and negligence of the defendant company in handling the shipment. Plaintiffs sued for the original cost price of the mules that died, plus carrying charges, and damage to each of the other 57 mules at $10 per head. The only disputed item of damage is that of $10 per head to the mules which lived. That item, we think, is amply proved. On the arrival of the animals at Delhi, they were all gaunt, stiff, and very much emaciated. The testimony shows that under ordinary conditions animals shipped the distance these were may be expected to be somewhat run down and out of

order, but that, with one or two days' rest, proper care, water and feed, they are restored to their normal condition. But these animals were in very much worse condition than they should have been. They were so run down, weak, and stiff that it took 5 days with the best of care to restore some of them, and as long as 21 days to restore some of the others. During this time they could not be put on the market, and had to be fed and cared for at an expense of approximately 75 cents per head for each day. Dr. Collins, who has dealt extensively in live stock, testified that, under ordinary and usual conditions, he could have put these animals on the market within 24 hours after their arrival, but that in this case he had to hold, feed, and care for them for quite a while, and both he and Mr. Patterson (who personally cared for the animals) testified that the extra cost of feeding, etc., amounted to an average of $10 per head. Mr. Alexander, of Shreveport, who has dealt in live stock for many years, says that it costs at least $1 per head a day to feed and care for mules and horses under such conditions; his estimate being higher than that of Dr. Collins and Mr. Patterson. If the unusual condition of the animals, which caused the delay in putting them on the market, was due to the fault and negligence of defendant, and we think it was, the loss occasioned thereby is a legitimate item of damage which may be recovered by plaintiffs, and we think the amount of such loss is fully established.

Counsel for defendant have not favored us with a brief, but, as we recall the oral argument, it was contended that defendant was guilty of no fault in handling the shipment, or at least that it was not proved that its negligence caused the death of the 3 mules and the damage to the others.

The animals were shipped under the uniform live stock contract or bill of lading, which contains the following stipulations printed on the back and as part thereof:

"Sec. 1. (a) Except in the case of its negligence proximately contributing thereto, no carrier or party in possession of all or any of the live stock herein described shall be liable for any loss thereof or damage thereto or delay caused by the act of God, the public enemy, quarantine, the authority of law, the inherent vice, weakness, or natural propensity of the animal, or the act or default of the shipper or owner, or the agent of either, or by riots, strikes, stoppage of labor or threatened violence.

"Sec. 1. (b) Unless caused by the negligence of the carrier or its employees, no carrier shall be liable for or on account of any injury or death sustained by said live stock occasioned by any of the following causes: Overloading, crowding one upon another, escaping from cars, pens, or vessels, kicking or goring or otherwise injuring themselves or each other, suffocation, fright, or fire caused by the shipper or the shipper's agent, heat or cold, changes in weather or delay caused by stress of weather or damage to or obstruction of track or other causes beyond the carrier's control."

Article 2754 of the Civil Code, makes carriers and watermen "liable for the loss or damage of the things entrusted to their care, unless they can prove that such loss or damage has been occasioned by accidental and uncontrollable events." Plaintiffs in this case have shown delivery of the animals to the defendant carrier and have proved their loss and damage. But defendant failed to discharge the burden laid upon it by the Code of proving that plaintiffs' loss or damage "has been occasioned by accidental and uncontrollable

events"; therefore, in the absence of the above-noted restrictions contained in the contract of shipment as to liability, the defendant would be liable, having failed to make the proof required by the Code. However, our Supreme Court has held, in the case of Simms & Son vs. N. O. & N. E. Ry. Co., 122 La. 268, 47 So. 602, and again in McHenry Horse Exchange vs. I. C. Ry. Co., 148 La. 49, 86 So. 649, construing similar provisions in other live stock bills of lading, that failure by the carrier to prove the cause of death of an animal in transit does not render it liable, in the absence of testimony showing the cause of death. The court in these cases gave full effect to the contract, which provides that the carrier shall be liable only in case of its negligence. In the Simms case, the court held:

"The precise cause of the injury is immaterial, if it did not result from the negligence of the carrier."

We think the testimony makes it reasonably certain that the death of the 3 mules and the damage to the others were due to the negligence of the carrier. The animals were unloaded en route at Shreveport for food, water and rest. One mule was then found dead in the car, but there is no testimony indicating that it had been injured, so that the cause of its death is a matter of inference. Two of the mules died at Delhi, after being unloaded. The veterinarian, who examined the mules and who testified for defendant, told Dr. Collins and the station agent that, in his opinion, they died of shipping fever, which disease in a mule or horse corresponds, so the experts say, to cold or influenza in a human being. Dr. Collins himself concurred in the view that the mules died of shipping fever. Mr. L. Robert, who lives at Fort Worth and was employed by the Western Weighing & Inspection Bureau,

and who, according to his testimony, represented the railroad, inspected the animals at the chute when they were loaded. He says that five of them had shipping fever, but that he did not consider them seriously affected, otherwise, he would not have accepted them for the carrier. He and others testified that shipping fever in animals, like "flu" in man, is a germ disease, is contagious, and may be contracted by contact with infected animals, or by the animal being placed in an infected pen, and that practically all of the stockyards in the country are infected with that germ. Neither Dr. Collins, who purchased the animals at the yards of Ross Bros. the day before they were shipped, nor anyone connected with the yards, noticed that any of the animals were sick with the fever. But the testimony we think supports the conclusion that, whether they had it then or contracted it later, they had it when they died. But there is nothing to indicate that this disease in the absence of any other cause, would have produced death. On the contrary, the testimony shows that the disease does not seriously affect the animals, if properly cared for, and we are convinced that, if the mules had been properly handled by the carrier, they would not have died, even though they had the fever.

The carrier was grossly negligent in handling this shipment. The animals were loaded at Fort Worth and received by the defendant company at 4:30 p. m., December 5th, and unloaded at Shreveport at 8:50 a. m., on December 7th. They were, therefore confined in the car continuously for more than 40 hours, during which time they had no rest, food, nor water. The train was delayed between Fort Worth and Shreveport about 10 hours, the greater portion of which time was taken in repairing an engine which should have been

repaired before beginning the journey. To start out with a bad engine is negligence. The other delays were due mainly to setting out and picking up cars. These delays were not caused by the "act of God, the public enemy, quarantine, the authority of law * * * riots, strikes, stoppage of labor or threatened violence," nor were they due to accidental causes, and therefore do not fall within the exceptions mentioned in the contract.

Under the rules and the federal statute which control in cases of this kind (U. S. Revised Statutes 1878, sections 4386-4389), a carrier is prohibited from confining animals without unloading for rest, food and water for a longer period of time than 28 consecutive hours, unless prevented from doing so by accidental causes. This period may be extended by consent to 36 hours, which was done in this case. But these animals were confined for more than 40 consecutive hours, without food, water or rest. This was negligence per se, and rendered the carrier liable for whatever damage that might have resulted therefrom. It has been held that, even though the delay be caused by an "act of God," the carrier is not relieved from liability arising from its negligence to feed, water and rest animals in the "entire absence of evidence that the act of God in any way interfered with the handling of the stock or providing it with food and water, and giving it such care as would insure its delivery at destination in good condition." 10 C. J., sec. 113, p. 98, and numerous authorities there cited.

There is no suggestion that the defendant could not have unloaded the animals for food, water and rest at some other point on its line before reaching Shreveport. The testimony shows that the stockpen at Shreveport, where these animals were unloaded for rest and food, was in such condition that they could not rest without lying down in mud and water. Mr. Alexander, a live stock dealer who lives in Shreveport, testified that he visited the pen at the request of plaintiffs only a day or so later, and that it was knee deep in mud; that there was no place for the animals to lie down; that it was kept wet by seepage water; and that conditions were so bad for stock that he at one time reported the matter to a humane officer. Not only that, it is admitted that the only food put out for these animals was a few bales of "prairie" or grass hay (which we understand to be a good filler, if the stock will eat it, but of scant food value). The animals remained in this pen for 6½ hours, when they were reloaded and sent to Delhi, arriving there at 1:30 the next day. This neglect of the animals on the part of the carrier unquestionably weakened them greatly and brought them to the condition in which they were found on their arrival at Delhi. According to the testimony of the veterinarians, the death of the 3 mules is easily traceable to this neglect. They say that shipping fever is greatly augmented by exposure in damp, muddy yards which causes the disease to flare up. Also, when the animals are weak, their power of resistance is lowered, which weakened condition, as stated by Mr. Withers, "gives the disease easy progress in its ravages." When an animal is strong, it resists the effects of the disease, but, when exposed or weakened by lack of food, water and rest, it succumbs easily and quickly. We have no doubt that, if these animals had been properly cared for and had not been weakened by lack of attention and by exposure, they would have survived the fever.

Our conclusion, therefore, is that plaintiffs' loss was due to the negligence of the carrier.

The judgment appealed from is therefore affirmed, with costs in both courts.